UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2021

(Argued: December 6, 2021     Decided: March 13, 2023)

Docket No. 20-3225

———————————————

REBECCA MCCUTCHEON, ON BEHALF OF THEMSELVES AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED, PAUL CAUFIELD, ON BEHALF OF THEMSELVES AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED,
*Plaintiffs-Appellees*,

v.

COLGATE-PALMOLIVE CO., COLGATE-PALMOLIVE CO. EMPLOYEE'S RET. INCOME
PLAN, LAURA FLAVIN, DANIEL MARSILI, EMPLOYEE RELATIONS COMMITTEE OF
COLGATE-PALMOLIVE CO.,
*Defendants-Appellants*.[*]

———————————————

Before:     LIVINGSTON, *Chief Judge*, SACK, *Circuit Judge,* and COGAN, *District
Judge*.[**]

Plaintiffs-appellees brought this class action under the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*,
arguing, *inter alia*, that defendant-appellant Colgate-Palmolive Co. miscalculated
residual annuities based on an erroneous interpretation of its retirement income
plan and improperly used a pre-retirement mortality discount to calculate
residual annuities, thereby working an impermissible forfeiture of benefits under
ERISA.  The district court granted summary judgment to plaintiffs-appellees on

---

[*] The Clerk of the Court is respectfully instructed to amend the caption to conform
with the above.

[**] Judge Brian M. Cogan, United States District Court for the Eastern District of
New York, sitting by designation.

these claims.  For the reasons set forth below, we agree.  We therefore **AFFIRM** the district court's order and final judgment.

EVAN R. CHESLER (Darin P. McAtee, Lauren R. Kennedy, *on the brief*), Cravath, Swaine & Moore LLP, New York, NY; Robert A. Long, Jr., Robert S. Newman, *on the brief*, Covington & Burling LLP, Washington, DC, *for Defendants-Appellants*.

LEON DAYAN (Elizabeth Oppenheimer, *on the brief*), Bredhoff & Kaiser, P.L.L.C., Washington, DC; Eli Gottesdiener, *on the brief*, Gottesdiener Law Firm, P.L.L.C., Brooklyn, NY, *for Plaintiffs-Appellees*.

SACK, *Circuit Judge*:

At its core, this appeal presents what seems to be a simple question of contract interpretation, obscured by the argot of federal law governing employee retirement income plans.  On one hand, the plaintiffs-appellees—a class of former employees of Colgate-Palmolive Co. ("Colgate")—assert that certain provisions of Colgate's retirement plan have a single, unambiguous meaning that entitles them to greater benefits.  On the other, the defendants-appellants— Colgate and some of its affiliated entities and officers—argue that those provisions are ambiguous, and that we must therefore defer to their preferred interpretation, which would result in lesser cumulative benefit payments to the plaintiff class.

2

After extensive litigation in which summary judgment was granted to the defendants on several counts,[1] the United States District Court for the Southern District of New York (Schofield, *J.*) granted summary judgment to the plaintiff class on a subset of its claims. In particular, the district court entered summary judgment for the plaintiffs on Count II, Errors 1 and 3, reasoning that Colgate had denied benefits based on two discrete errors in administering a 2005 amendment to the plan that provided for residual annuity benefits to certain plan participants. Colgate now appeals that order and final judgment of the district court. We conclude that the plaintiffs-appellees' interpretation of Colgate's retirement plan is the unambiguously correct reading of the plan's text, and therefore AFFIRM the district court's order and final judgment granting summary judgment to the plaintiffs-appellees on Count II, Errors 1 and 3.

## BACKGROUND

A.   <u>Factual Background</u>

Defendant-appellant Colgate is a global consumer products company that sponsored the Colgate-Palmolive Co.'s Employees' Retirement Income Plan (the

---

[1] The initial grant of summary judgment with respect to those claims is not before us on appeal.

"Plan"), an employee pension benefit plan.

### 1. *The Plan's conversion to a cash balance plan*

The issues in this appeal stem from the Plan's conversion from a final-average-pay plan to a cash-balance plan in 1989.[2] Prior to 1989, the Plan operated as a final-average-pay plan, meaning that a member's "accrued benefit" was calculated based on her final average earnings, along with her years of service and estimated Social Security benefits. Under this earlier iteration of the Plan, each member (also referred to as a participant) could receive a retirement benefit *only* in the form of a monthly annuity beginning at the normal retirement age of 65 (hereinafter referred to as the "grandfathered" annuity, for reasons that should soon become clear).

In 1989, Colgate converted the Plan to a cash-balance plan which provided participants with an accrued benefit expressed as a hypothetical cash balance in a Personal Retirement Account, or PRA (the "PRA benefit"). Over time, Colgate credited each member's PRA with a fixed percentage of her annual pay plus

---

[2] To be precise, the Plan was amended in 1994, with retroactive effect as of July 1, 1989. This amendment is therefore applicable to all class members paid between July 1, 1989, and the effective date of the new 2003 Plan. For the purpose of simplifying the complex timeline of relevant events, we refer to the Plan's conversion to a cash-balance model as occurring in 1989.

interest.  Unlike the pre-1989 version of the Plan (in which members could receive grandfathered benefits only as an annuity), the cash-balance plan offered participants a choice to receive their PRA benefit as *either* a lump sum *or* a lifetime monthly annuity.

After the Plan shifted from final-average-pay to cash-balance, Colgate needed to account for those participants who had already accrued benefits under the pre-1989 plan but remained employed after the conversion.  To do so, Colgate grandfathered participants who had already accrued benefits under the prior final-average-pay plan and offered them the option to purchase the continuing accrual of grandfathered benefits while *also* accruing PRA benefits under the new Plan formula.  These participants' rights are contained in Plan Appendices A, B, C, and D.  *See* App'x 464–87.[3]  As relevant here, those grandfathered participants could elect to receive their ultimate benefit as either a lump sum payment or an annuity.  According to Appendix C § 2(b), if a grandfathered participant chose to receive an annuity, she was "eligible" to

---

[3] Generally, Appendix A defines various terms used in calculating grandfathered benefits, Appendix B specifies how to calculate grandfathered benefits, and Appendices C and D describe the benefits available to certain participants who remained employed after the Plan's 1989 conversion.

receive the "larger of" the two different annuities that were accruing: (i) her grandfathered annuity, or (ii) her PRA annuity adjusted to include her contributions toward maintaining the grandfathered annuity.[4] *Id.* at 480–81. If, on the other hand, a grandfathered participant chose to receive a lump sum, Appendix C § 2(a) provides that the lump sum would reflect the value of her accrued PRA benefit plus the value of any contributions she made to continue her prior grandfathered benefits. *See id.* at 480.[5]

### 2. Colgate's calculation of benefits leads to two distinct forfeitures

To resolve the issues raised on appeal, we must first review some of the legal requirements that govern the Plan and how Colgate's failure to comply with those requirements led to two distinct forfeitures of benefits.

The parties agree that at all relevant times the Plan was a "defined benefit plan" under the Employee Retirement Income Security Act of 1975 ("ERISA"), 29

---

[4] We refer to the larger of these two annuities hereinafter as a participant's "winning" annuity.

[5] Because of the way in which Appendix C is drafted, there are multiple provisions that could be identified as "Appendix C § 2(a)" or "Appendix C § 2(b)." In this opinion, we use those terms to refer to the corresponding provisions found in the record at App'x 480–81, which "shall be applicable" "[i]f a Member elects to make Contributions to Maintain Prior Plan Benefits starting July 1, 1989 and continues to do so until h[er] separation from service." App'x 480.

U.S.C. § 1001 *et seq.*, because the plan guarantees a defined level of benefits, known as accrued benefits. For defined benefit plans, ERISA defines the term "accrued benefit" to mean "the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A). In other words, "the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age," which here is 65. *Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000).[6]

The value of the age-65 annuity to which a participant is entitled under the Plan terms serves as the baseline against which a participant's actual benefits are measured. That said, ERISA does not restrict an employer to providing a benefit only in the form of an annuity; it can also offer an employee the option to receive benefits in a lump sum instead. But the "present value" requirements of § 417(e) of the Internal Revenue Code ("I.R.C.") and § 205(g) of ERISA require that, under

---

[6] Federal law defines an "accrued benefit" as an "annual benefit," i.e., an annuity. ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A). Somewhat oxymoronically, the Plan offers a "monthly annuity." *See, e.g.*, App'x 405, 434–35. For the sake of simplicity, because the Plan's monthly benefit is effectively a traditional annuity paid out in more frequent installments, we treat the "monthly annuity" to which a member is entitled under the Plan as the legally defined "accrued benefit" against which any optional form of the benefit should be compared.

a defined benefit plan, any lump sum distribution be the actuarial equivalent of a member's normal retirement benefit. *See* I.R.C. § 417(e); ERISA § 205(g), 29 U.S.C. § 1055(g); *see also Esden*, 229 F.3d at 163–64. In other words, any lump sum's value must be equal to the value of the age 65 single life annuity to which the member is otherwise entitled, accounting for, among other things, the time value of money and the life expectancy of the recipient. This actuarial-equivalence requirement is designed to protect employees from employers who might entice them "to sell their pension entitlement back to the company cheap" by offering a lump sum option that is less valuable than the delayed annuity they would receive upon reaching retirement age. *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 762 (7th Cir. 2003).

The first forfeiture caused by Colgate's implementation of the Plan involves a so-called "whipsaw violation," which relates to the inequivalence of the two optional forms of the PRA benefit: the PRA lump sum and the PRA annuity. To ensure that a lump sum is actuarially equivalent to the retirement-age annuity guaranteed by a cash-balance plan, the plan administrator (here, Colgate) must perform what is known as a whipsaw calculation. *See Laurent v. Pricewaterhouse Coopers LLP*, 794 F.3d 272, 275 (2d Cir. 2015) (explaining that a

8

whipsaw calculation is used to determine the "difference between the hypothetical value of a cash balance plan account at any given time and the value of the account as an annuity payable at normal retirement age"). Generally speaking, to perform the whipsaw calculation, a plan administrator typically projects a participant's hypothetical cash balance forward to normal retirement age using a certain interest rate (the "projection rate") and then discounts that amount back to present value with a certain interest rate (the "discount rate"). Projection rates may be set by a plan, but the discount rate is statutorily capped. *See Esden*, 229 F.3d at 159. In the context of the Plan, to properly compute a participant's lump sum benefit, Colgate had to increase the participant's hypothetical cash balance to age 65 using the plan-prescribed "projection rate," convert that amount into the age 65 annuity (i.e., the PRA annuity), convert that age 65 annuity to a lump sum, and finally discount the lump sum back to present value using the statutorily-prescribed "discount rate."[7]

---

[7] Colgate amended the Plan in 2003 so that the projection rate used to convert a member's cash balance to age 65 was the same as the discount rate prescribed by I.R.C. § 417(e). The whipsaw violation was therefore resolved on a prospective basis as of the date of this amendment, but it remained an issue retrospectively for participants who had been underpaid while the higher projection rate was in effect.

As relevant to the class members before us, § 1.3 of the Plan selected as a projection rate the 20-year Treasury bill interest rate plus 1% (the "20+1% rate"). *See* App'x 405–06 (requiring that the 20+1% rate must be used "[f]or purposes of converting a Member's Account into a single life annuity payable for the life of the Member starting at Normal Retirement Date"). In the whipsaw calculation, that rate was used to project the hypothetical PRA account balance forward to the age of 65 and to convert that projected balance into the PRA annuity. The discount rate used to bring the age 65 projected lump sum back to present value is set by I.R.C. § 417(e). From 1989 to 2002, federal law mandated that the discount rate could not be higher than the Pension Benefit Guaranty Corporation rate (the "PBGC rate"). *See McCutcheon v. Colgate-Palmolive Co.* (*Colgate II*), 481 F. Supp. 3d 252, 257 (S.D.N.Y. 2020) (citing I.R.C. § 417(e)(3)(C); I.R.S. Notice 87-20, 1987-1 C.B. 456 (Feb. 9, 1987)).

For the relevant period, however, Colgate used the 20+1% rate as *both* the projection rate *and* the discount rate, despite the 20+1% rate being considerably higher than the PBGC rate during that time. *See* App'x 1367. As a result of using the same rate to project and discount, a member who elected to receive her benefits as a lump sum received a payment that was necessarily equal to her

hypothetical PRA account value. Insofar as this undervalued lump sum was not actuarially equivalent to a member's accrued benefit, these participants suffered a forfeiture.

The second forfeiture at issue is a "grandfathered benefit forfeiture," which relates to the Plan's failure to compare the PRA lump sum to the grandfathered annuity for certain members who continued to make contributions to maintain their grandfathered benefits. As previously noted, these grandfathered participants effectively had two benefits accruing at the same time, and the Plan gave them the option to choose to receive either an annuity or a lump sum—the values of which were required to be actuarially equivalent. For the purposes of present-value requirements under federal law, a grandfathered member's "accrued benefit"—i.e., the baseline annuity to which her lump sum payment must be actuarially equivalent—was the age 65 single life annuity to which she was entitled under the Plan. *See* I.R.C. § 411(a)(7) (defining "accrued benefit"); *accord* ERISA § 3(23)(A). Under Appendix C § 2(b), that "accrued benefit" would be her "winning" annuity, i.e., whichever of the PRA annuity or grandfathered annuity was more valuable. But because there was no lump-sum form of the grandfathered benefit, under Appendix C § 2(a), a participant who elected to

11

receive a lump sum would obtain a payment that (at least in theory) reflected only the value of her PRA annuity, even if her winning annuity—and, thus, her legally defined accrued benefit—was her grandfathered annuity.[8] As a result, some members whose larger grandfathered annuities were their "winning" annuities received lump sum payments that (if properly calculated) would only be actuarially equivalent to their smaller PRA annuities.

Thus, a member with a winning grandfathered annuity who elected a lump sum payment suffered two nested forfeitures: first, her PRA lump sum was not actuarially equivalent to her PRA annuity because of Colgate's whipsaw violation, and second, even if the two forms of the PRA benefit had been actuarially equivalent, her properly calculated PRA lump sum still would have been worth less than the present value of her winning grandfathered annuity.

### 3. The Residual Annuity Amendment

In 2005, Colgate amended the Plan through a Residual Annuity Amendment (the "RAA"). The RAA applied retroactively "[e]ffective as of July 1, 1989," and granted a residual annuity benefit to any participant who (i) elected a

---

[8] We say "in theory" because, as noted above, a member's PRA lump sum was *not* the actuarial equivalent of her accrued PRA benefit due to the separate whipsaw violation.

lump sum payment and (ii) was "entitled to a greater benefit than h[er] Accrued Benefit" as defined under the Plan.  App'x 366.[9]

The core of the issues on appeal concern Colgate's interpretation and implementation of the RAA.  In pertinent part, the RAA provides that a qualifying member's residual annuity "shall be computed by subtracting the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment from the age 65 single life annuity benefit otherwise payable to the Member under Appendices B, C, or D, as applicable."  App'x 366.  Parsing this clause, the amount of a qualifying member's residual annuity under the RAA equals the difference between two values.  The first value is "the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment."  *Id.* In less technical terms, this figure reflects the value of the lump sum payment that the member actually received, converted into an annuity payable at the age of 65 for the purpose of comparison.  The first value is therefore a hypothetical

---

[9] Section 1.2 of the Plan defines "Accrued Benefit" as "a monthly annuity for the life of the Member . . . commencing at Normal Retirement Age or any later date, which is the Actuarial Equivalent of the Member's Account[.]"  App'x 405.  In other words, this aspect of the Plan's definition of "Accrued Benefit" refers to a participant's PRA annuity.

annuity that is the actuarial equivalent of the lump sum payment that Colgate paid to a member (the "AE of LS").

The second value (from which the AE of LS is subtracted to calculate the residual annuity) is the "age 65 single life annuity benefit otherwise payable to the Member under Appendices B, C or D, as applicable." *Id.* As the precise meaning of this clause is critical to this appeal, it is discussed at some length below. According to the defendants-appellants, in 2004, Colgate discovered the grandfathered benefit forfeiture described above and adopted the RAA to address *only* that forfeiture. *See* Appellants' Br. 14. Thus, Colgate contends that the "age 65 single life annuity benefit otherwise payable to the Member under Appendices B, C or D, as applicable," refers only to the grandfathered annuity (and not to the PRA annuity, even if it is a member's winning annuity). *Id.* at 14–15 (quoting App'x 366). The plaintiffs-appellees, on the other hand, contend that this language unambiguously refers to a member's winning annuity under Appendix C § 2(b) and argue that whatever the RAA's purpose, its plain language operates to remedy both the grandfathered benefit forfeiture and the whipsaw forfeiture for covered participants. *See* Appellees' Br. 11.

14

Although the RAA was technically effective as of July 1, 1989, Colgate initially implemented the RAA only prospectively, granting residual annuities to qualifying employees who retired after its adoption in 2005. Thus, at first, there was no retroactive application of the RAA to participants who retired between July 1989 and February 2005.

### 4. *The* Colgate I *settlement and retroactive RAA application*

In 2007, an ERISA class action was initiated against Colgate on behalf of thousands of Plan participants who alleged that Colgate had miscalculated their pension benefits as a result of the whipsaw violation. *See In re Colgate-Palmolive Co. ERISA Litig.* (*Colgate I*), 36 F. Supp. 3d 344, 347 (S.D.N.Y. 2014). The class was comprised of former Colgate employees—including both those whose employment started before and after the 1989 plan conversion—who had elected to receive their PRA benefit as a lump sum, but who received lump sums worth less than the actuarial equivalent of the PRA annuity benefit to which they were entitled, in violation of § 417(e)'s present-value requirements.

In May 2010, the parties in *Colgate I* reached a preliminary agreement to settle the plaintiffs' claims. At the time of this preliminary agreement, plaintiffs' counsel was unaware of the existence of the RAA. Upon learning of the RAA in

July 2011, the plaintiffs continued their efforts to settle *Colgate I*, which eventually culminated in a settlement agreement that excluded from its scope "any and all past, present and future" claims "that are based upon, or arise under the Residual Annuity Amendment." App'x 304. In July 2014, the United States District Court for the Southern District of New York (Schofield, *J.*) approved this $45 million settlement. *See Colgate I*, No. 07–cv–9515, 2014 WL 7929831 (S.D.N.Y. July 8, 2014) (final order and judgment); *see also Colgate I*, 36 F. Supp. 3d at 346.

After disclosure of the RAA during the *Colgate I* settlement proceedings, Colgate began to implement the RAA retroactively, granting millions of dollars of additional annuity benefits to several hundred former participants who had opted to receive lump sum payments between 1989 and 2005. Based on Colgate's reading of the RAA, it calculated those members' residual annuities by subtracting the AE of LS from the grandfathered annuity exclusively, even when a member's PRA annuity—rather than the grandfathered annuity—was her "winning" annuity under the Plan.

### 5. *McCutcheon's administrative claim and appeal*

Plaintiff-appellee Rebecca McCutcheon was a Colgate employee from 1979 to 1994. McCutcheon made contributions to continue her eligibility for

16

grandfathered benefits after the Plan's 1989 conversion and elected to receive her pension benefit as a lump sum at the time of her resignation. She also received a settlement payment as part of the *Colgate I* litigation.

On July 30, 2014, McCutcheon filed an administrative claim alleging that she was entitled to a residual annuity under the RAA.[10] By letter dated November 4, 2014, the Employee Relations Committee of Colgate-Palmolive Co. (the "Committee") denied her claim, determining that she was not entitled to any additional benefit under the RAA because the age 65 actuarial equivalent of her lump sum plus her *Colgate I* settlement proceeds was greater than her grandfathered annuity. On April 6, 2015, McCutcheon appealed the Committee's denial, identifying four errors that the Committee allegedly committed when calculating her residual annuity. On June 4, 2015, the Committee denied her appeal.

---

[10] Colgate calculated McCutcheon's grandfathered annuity as $731.31 per month and her PRA annuity as $1,125.38 per month. *See* App'x 790 ¶ 211. Therefore, her winning annuity under Appendix C § 2(b) was her PRA annuity. She elected to receive a lump sum of $22,425.64, and she received a *Colgate I* settlement of $11,226.03 before expenses and fees. *See* App'x 373. Based on the value of her lump sum and settlement, Colgate calculated her AE of LS as $752.84. *See* App'x 374. Therefore, based on Colgate's calculations, her lump sum payment was worth more than her grandfathered annuity, but less than her winning PRA annuity.

B.      District Court Proceedings

After her administrative appeal was denied, McCutcheon filed this action

in the United States District Court for the Southern District of New York on

behalf of a putative class against Colgate, the Plan, the Committee, and two

Colgate Vice Presidents who served on the Committee, Laura Flavin and Daniel

Marsili.[11]  Count I, which is not a class claim and is not before us on appeal,

alleged that the defendants violated 29 C.F.R. § 2560.503-1 by failing to produce

all relevant documents and information during McCutcheon's claim and appeal.

Count II, which is before us, alleged that the class plaintiffs were wrongly denied

residual annuities under the RAA based on four distinct errors Colgate made

when interpreting and calculating such benefits.  The district court granted the

motion for class certification as to Count II and appointed McCutcheon as the

class representative.  *Caufield v. Colgate-Palmolive Co.*, No. 16-cv-4170, 2017 WL

3206339, at *6, *8 (S.D.N.Y. July 27, 2017).  As explained by the district court,

"each Class Member (1) was a Colgate employee in July 1989, (2) received a lump

sum payment from the Plan and (3) is entitled to a greater benefit under any of

---

[11] The complaint originally asserted five causes of action, but the magistrate
judge overseeing the pre-trial proceedings bifurcated the case and ordered only
Counts I and II to proceed.

Appendices B, C or D than his or her Accrued Benefit as defined in Plan § 1.2."

*Colgate II*, 481 F. Supp. 3d at 260. The plaintiffs estimate that the class contains approximately 1,200 people with claims totaling some $300 million.

After two years of discovery, Colgate moved for summary judgment. The district court granted the motion in part, dismissing (i) Count I; (ii) Count II, Error 2; and (iii) Count II, Error 4 as to the Class but not as to McCutcheon herself. *See McCutcheon v. Colgate-Palmolive Co.*, No. 16-cv-4170, 2020 WL 3893303, at *16 (S.D.N.Y. July 10, 2020).[12] The district court denied summary judgment to Colgate on Count II, Errors 1 and 3. *See id.* The plaintiffs subsequently moved for summary judgment on Count II, Errors 1 and 3, and

---

[12] In Error 2, the plaintiffs argued that Colgate used the wrong Plan provision to determine the Estimated Social Security Primary Insurance Amount when calculating benefits under the grandfathered formula. *See* App'x 193. In Error 4, the plaintiffs argued that, while the *Colgate I* settlement agreement required future residual annuities to be offset by any settlement proceeds, the Plan itself was not amended prior to applying the offsets to the payments, and retroactively amending the plan after applying the offsets would result in an impermissible cutback in benefits under ERISA and the I.R.C. *See* App'x 195. The district court denied summary judgment on Error 4 as to McCutcheon because it found a more generous standard of review applied to her claim specifically than the class's Error 4 claim. *McCutcheon*, 2020 WL 3893303, at *15–16. McCutcheon subsequently waived her right to de novo review of her claim based on this Error, which effectively merged her individual claim with the class's claim that the district court dismissed. *See Colgate II*, 481 F. Supp. 3d at 270. Neither of these alleged Errors is before us on appeal.

sought entry of a final judgment in their favor. On August 24, 2020, the district court issued an order granting the plaintiffs' motion for summary judgment. *Colgate II*, 481 F. Supp. 3d at 256.

In Error 1, the plaintiffs claimed that Colgate miscalculated residual annuities, leading to a forfeiture. *Id.* at 261. The district court determined that Colgate's reading of the RAA—that both eligibility and the amount of the residual annuity is determined by comparing the lump sum paid with only the grandfathered annuity—was erroneous as a matter of law. *Id.* As to eligibility, the district court agreed with the plaintiffs that "if either the Grandfathered benefit exceeds the Accrued Benefit as defined in Plan § 1.2 [i.e., the PRA annuity] or the participant elected to make Employee Contributions, then the participant will be entitled to a Residual Annuity." *Id.* at 262. The court then concluded that "[b]ased on a plain reading of the RAA," "the amount of the Residual Annuity is determined by comparing the Age 65 AE of LS . . . with the *greater of* the Grandfathered Benefit *or* the Member's Accrued Benefit as defined in Plan § 1.2 [i.e., the PRA annuity] plus Employee Contributions." *Id.* (emphasis in original).

In Error 3, the plaintiffs asserted that Colgate violated ERISA when it used

a pre-retirement mortality discount ("PRMD") to determine actuarial equivalence when calculating residual annuities. *See id.* at 266–67. Generally speaking, when calculating the present value of a retirement benefit, a mortality discount can be used to account for the possibility that a participant may die before reaching the eligibility age for that benefit. Here, pursuant to the Plan's terms, Colgate incorporated a PRMD when calculating a participant's AE of LS and age 65 annuity benefit, thereby diminishing the value of the residual annuities under the RAA. The district court granted summary judgment to the plaintiffs on Error 3 on the ground that the defendants failed to respond to the plaintiffs' arguments in their opposition brief. *Id.* at 267. Nevertheless discussing the merits, the court explained that, under the Plan, a member's benefit "must be paid in all events and does not decrease if the Participant dies prior to reaching age sixty-five." *Id.* at 268. That is, if a member were to die prior to retirement age, a benefit of substantially similar value is nonetheless paid to that member's beneficiary. The district court adopted reasoning from cases in our sister circuits that "applying a pre-retirement mortality discount to a retirement benefit that does not decrease if the participant dies would result in a lump sum that was less than the actuarial equivalent of the annuity it [was] supposed to replace," and would "result in a

forfeiture prohibited by ERISA." *Id.* at 267 (alteration in original) (citation omitted).

Finally, the district court ordered Colgate to recalculate all class members' RAA annuities using the 20+1% rate as the projection rate to convert a below-retirement-age participant's cash balance into an age 65 annuity and the PBGC rate as the discount rate to determine the Age 65 AE of LS. *Id.* at 269.

The defendants-appellants now appeal the district court's grant of summary judgment to the plaintiffs-appellees on Count II, Errors 1 and 3, and the district court's determination that Colgate must use the above-mentioned rates to recalculate participants' residual annuities.

## DISCUSSION

### I. Standard of Review

"We review a district court's decision to grant summary judgment *de novo*, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor." *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 47 (2d Cir. 2016) (citation omitted). Summary judgment is appropriate if the record establishes that "there is no genuine dispute as to any material fact and the

22

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A

genuine issue of material fact exists if 'the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive*

*Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (citation omitted).  In ERISA cases

where a pension plan participant moves for summary judgment against a plan

administrator, summary judgment is appropriate when the plan language

"unambiguously" supports the participant's interpretation.  *See O'Neil v. Ret. Plan*

*for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58–59 (2d Cir. 1994).

## II.    Error 1

With respect to Error 1, the plaintiffs claimed that Colgate had

miscalculated class members' residual annuities, resulting in an impermissible

forfeiture of benefits.  Based on its interpretation of the RAA's text, Colgate had

calculated residual annuities by comparing the AE of LS only with a member's

grandfathered annuity.  The district court granted summary judgment to the

class, concluding that the unambiguous language of the Plan required Colgate to

calculate residual annuities by comparing the AE of LS with the greater of (i) the

grandfathered annuity or (ii) the PRA annuity plus employee contributions made

to maintain eligibility for grandfathered benefits.  *See Colgate II*, 481 F. Supp. 3d

at 262.  Under the district court's interpretation, an eligible member would receive a residual annuity if either of those annuities is greater than the value of the lump sum they were paid.

We agree with the district court that the text of the RAA is unambiguous and requires Colgate to calculate a member's residual annuity by subtracting the AE of LS from that member's winning annuity under Appendix C § 2(b).

A.          Relevant Plan Provisions

Central to this appeal is the language of the RAA and the related language of Plan Appendix C § 2(b), which the parties agree is the relevant appendix provision for purposes of the analysis.

The RAA states, in relevant part:

Effective as of July 1, 1989, a Member who, under any of Appendices B, C or D, is entitled to a greater benefit than his Accrued Benefit . . . , and who chooses to receive his benefit under this Lump Sum Payment Option, which is the Actuarial Equivalent of his Accrued Benefit . . . , shall receive in addition to such lump sum payment an additional benefit, commencing at the same time and payable in the standard form applicable to such Member . . . .  A Member may not elect any other form of payment option with respect to this additional benefit.

Such additional benefit shall be computed by subtracting the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment [i.e., the AE of LS] from *the age 65 single life annuity benefit otherwise payable* to the Member under Appendices B, C or D, *as applicable*, and applying to such remainder early retirement

24

reductions applicable to the Member's benefit based on the Member's age at benefit commencement.

App'x 366 (emphases added).

Appendix C § 2(b) states, in relevant part:

If [a member] elects to receive an annuity settlement instead of a single lump sum payment, he *shall be eligible* for an annuity pursuant to Section 6.2 . . ., Section 6.3 . . . or Section 6.4(a)(ii) . . . of the Plan that provides for him to receive *the larger of*:

(i)     the benefit that he would have received had he continued under the Plan as in effect prior to July 1, 1989, pursuant to Appendix B . . . [i.e., his grandfathered annuity]; or

(ii)    the benefit payable pursuant to Section 6.2 . . . , Section 6.3 . . . or Section 6.4(a)(ii) . . . of the Plan [i.e., his PRA annuity], which is the Actuarial Equivalent of the Member's Accrued Benefit . . . plus his Contributions to Maintain Prior Plan Benefits with interest . . . at his Benefit Commencement Date.

App'x 480–81 (emphases added).

B.        Principles for Construction of Plans

"ERISA plans are construed according to federal common law," *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002), and general principles of contract law apply to their interpretation, *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) (per curiam).  The first step in interpreting a plan is to determine whether the plan's terms are ambiguous.  *See Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d

234, 244 n.6 (2d Cir. 2007); *O'Neil*, 37 F.3d at 58–59. "Whether ERISA plan language 'is ambiguous is a question of law that is resolved by reference to the contract alone.'" *Strom*, 497 F.3d at 244 n.6 (quoting *O'Neil*, 37 F.3d at 59). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *O'Neil*, 37 F.3d at 59 (ellipsis, internal quotation marks, and citation omitted).

If a plan's terms are unambiguous, they must be enforced according to those terms without regard for how the plan administrator has otherwise interpreted the language "because unambiguous language leaves no room for the exercise of discretion." *Id.* Thus, "[w]here the language is plain and unambiguous, a court may construe the [plan] and grant summary judgment." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148 (2d Cir. 1993). Conversely, if a plan's language is ambiguous and the "plan[] invest[s] the administrator with broad discretionary authority to determine eligibility," it will be "reviewed under the arbitrary and capricious standard." *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 145 (2d Cir. 2003); *accord O'Neil*, 37 F.3d at 59. When a plan's language is ambiguous and "both the [administrator] of [the plan] and a

26

rejected applicant offer rational, though conflicting, interpretations of plan

provisions, the [administrator's] interpretation must be allowed to control."

*Novella v. Westchester Cnty.*, 661 F.3d 128, 140 (2d Cir. 2011) (citation omitted).

Therefore, whether the language of the plan is ambiguous effectively

determines the outcome of our analysis. That is, if the RAA unambiguously

requires the plaintiffs-appellees' interpretation, we must affirm the district

court's grant of summary judgment. But if the RAA is ambiguous and Colgate's

preferred reading is reasonable, we would almost surely defer to that reasonable

interpretation.

C.        Ambiguity Analysis

We conclude that the text of the RAA unambiguously requires comparing

the AE of LS to a participant's Appendix C § 2(b) winning annuity. We are

unpersuaded by Colgate's attempt to discredit the district court's assertedly

unambiguous reading as "illogical." *See* Appellants' Br. 29. We also reject

Colgate's proposed alternative interpretation of the RAA, which is not, we think,

a reasonable reading of the RAA's text, but rather an impermissible effort to

introduce ambiguity by reference to extrinsic evidence of the RAA's alleged

purpose. Accordingly, we affirm the district court's grant of summary judgment to the class members on Error 1.

*1. The Plan unambiguously requires residual annuities to be calculated by comparing the AE of LS to the Appendix C § 2(b) winning annuity*

The ambiguity dispute in this case focuses primarily on one sentence in the RAA, which states that the amount of the residual annuity "shall be computed by subtracting the age 65 single life annuity Actuarial Equivalent amount of the Member's lump sum payment [i.e., the AE of LS] from *the age 65 single life annuity benefit otherwise payable to the Member under Appendices B, C or D, as applicable*." App'x 366 (emphasis added). We begin our analysis of whether this language is ambiguous, as we must, "by reference to the contract alone." *Strom*, 497 F.3d at 244 n.6 (citation omitted).

Under the RAA, a residual annuity is computed by calculating the difference between (1) the AE of LS—which represents the "amount of the Member's lump sum payment" expressed as an annuity for comparison's sake— and (2) the "annuity benefit" that is "*otherwise payable* to the Member under Appendices B, C or D, *as applicable*." App'x 366 (emphases added). Thus, to determine that second value, the plan administrator must first find the Appendix provision that is "applicable" and then identify which "annuity benefit" is

"otherwise payable to the Member under" that Appendix provision.

In McCutcheon's case, there is no doubt which Appendix provision is referenced by the words "as applicable" in the RAA: the first portion of Appendix C § 2 states that "[i]f a Member elects to make Contributions to Maintain Prior Plan Benefits [i.e., grandfathered benefits] starting July l, 1989 and continues to do so until h[er] separation from service"—as McCutcheon did—"the following provisions *shall be applicable*." *Id.* at 480 (emphasis added).[13]

Having identified the "applicable" appendix provisions, we must then determine which "annuity benefit" is "otherwise payable" to the member under that portion of Appendix C § 2. The applicable language in Appendix C § 2 is structured as a binary between lump sums, in § 2(a), and annuities, in § 2(b). *See id.* at 480–81. Subsection 2(a) states that members "shall be entitled to receive a

---

[13] While these provisions of Appendix C § 2 are applicable here, there are numerous other provisions that could be "applicable" depending on a member's particular circumstances. To provide a few examples, Appendix B includes "Special Rules Applicable to Certain Employees" specified therein, App'x 469; Appendix C § 2 includes many other provisions, including some that "shall be applicable" to any member who "rescind[s] h[er] decision to make Contributions to Maintain [grandfathered benefits]" "[a]t any point before termination of employment," *see* App'x 481–82; Appendix C § 3 includes provisions that "shall be applicable" when "a Member elects not to make Contributions to Maintain [grandfathered] Benefits," *see* App'x 482; and Appendix D § 2 includes provisions that "shall be applicable" to certain "Older Employees," *see* App'x 485.

single lump sum payment," as McCutcheon chose to do. *Id.* at 480; *see also id.* at 542. Subsection 2(b) identifies which annuity benefit a member like McCutcheon would have received had she "elect[ed] to receive an annuity settlement instead of a single lump sum payment." *Id.* at 480. In that circumstance, a member "shall be eligible for . . . the larger of" (i) the grandfathered annuity or (ii) the PRA annuity plus employee contributions. *Id.* at 480–81. To summarize, under the "applicable" appendix provision, if a lump sum recipient had instead elected to receive an annuity, the "annuity benefit" that she "otherwise" would have been paid is her Appendix C § 2(b) winning annuity, i.e., the larger of her grandfathered annuity or her PRA annuity.[14]

The clear text of the Plan, without more, thus settles the question of ambiguity: the RAA is not ambiguous. The text plainly requires a comparison between the AE of LS and, in this case, a member's winning annuity under Appendix C § 2(b).

Before engaging with Colgate's preferred alternative reading, first we

---

[14] Further, for a member like McCutcheon (whose PRA annuity plus employee contributions is larger than her grandfathered annuity), the grandfathered annuity is decidedly *not* "otherwise payable" because, per Appendix C § 2(b), she is only "eligible for" the "larger" PRA annuity.

address Colgate's primary textual counterargument that the interpretation outlined above is, in fact, a wholly unreasonable construction of the RAA's text. For some members (like McCutcheon), our interpretation of the RAA requires a comparison between the values of the PRA lump sum and the PRA annuity. Colgate warns that "[a] comparison of the 'new' PRA lump sum and the 'new' PRA-based annuity is illogical because . . . the [PRA] Annuity is expressly defined in the Plan to be the *same benefit* the Participant already received as a lump sum," and therefore cannot be the "otherwise payable" benefit specified in the RAA. Appellants' Br. 29 (emphasis in original). Colgate asserts that "[t]he District Court side-stepped the question of whether, as a matter of plan interpretation, the 'new' PRA lump sum and the 'new' [PRA] Annuity are the *same benefit*." *Id.* at 32 (emphasis in original). But, for the reasons explained below, Colgate's question is a red herring.

First, Colgate asserts that once a member has been paid a PRA lump sum, the PRA annuity "cannot be the 'otherwise payable' *benefit* specified in the RAA because that *benefit* was already paid" to the member in a different form. *Id.* at 29 (emphases in original). But Colgate omits a significant word from the text of the Plan: the RAA does not direct the Plan administrator to identify the "*benefit*

31

otherwise payable" to a member (as Colgate insists); rather, it refers to the "*annuity benefit* otherwise payable." *See* App'x 366 (emphases added). Even if the PRA lump sum and the PRA annuity are different forms of the same benefit, the lump sum is not an "annuity benefit." Therefore, the fact that a lump sum version of the PRA benefit had already been paid does not have an impact on whether the PRA annuity could be an "otherwise payable" "annuity benefit."[15] To the contrary, the annuity benefit McCutcheon would otherwise have been paid is her PRA annuity had she not elected to receive a lump sum payment.

Second, Colgate is too quick to dismiss the significance of the RAA's invocation of the AE of LS, a computational construct representing the hypothetical annuitized value of the lump sum payment actually paid to a member for the sake of comparison. *See* Appellants' Br. 34 (referring to the district court's focus on the distinction between the PRA annuity and the AE of

---

[15] To the extent that Colgate argues that the PRA annuity is not otherwise payable because a member is not entitled to receive the same benefit twice in different forms, this argument would render the RAA a nullity. This argument is premised on the unavailability of a PRA annuity once the lump sum option has already been elected. But under that premise, neither the PRA annuity nor the grandfathered annuity would be "otherwise payable" because a member would not be "eligible for [either] annuity" once she elected the lump sum option. App'x 480.

LS as "an attack on a straw man"). It would be undeniably odd—perhaps even "illogical"—if the RAA required comparison of a benefit to itself, such that the two values would always be perfectly actuarially equivalent and the resulting residual annuity would always equal zero. But that is not what the RAA does.

As an initial matter—and as emphasized by the district court—from a mathematical perspective, the two values are not equivalent because they are based on different interest rate assumptions. For reasons discussed in more detail *infra* Section III, we agree that the AE of LS is calculated using the PBGC rate, while the PRA annuity is projected using the higher 20+1% rate. *See Colgate II*, 481 F. Supp. 3d at 264–65. Further, the RAA compares the undervalued lump sum that a member actually received—represented in the AE of LS—with the full annuity benefit to which they were legally entitled. The RAA, which was adopted in 2005, was intended to apply retroactively to 1989, thereby covering the entire whipsaw violation period.[16] During that period, a member's lump sum payment was not actuarially equivalent to her PRA annuity, even though it

---

[16] The RAA also applied prospectively, but for reasons we address *infra* Section II.C.3, we conclude that the RAA's prospective application—despite the Plan's amendment to eliminate the whipsaw issue in 2003—has no bearing on whether the RAA can also remedy past whipsaw violations.

should have been under federal law. This discrepancy—between the legally

mandated equivalence of the two forms of the PRA benefit and their real-world

inequivalence—makes it wholly reasonable for the RAA to compare the

undervalued lump sum that a member received to the PRA annuity to which she

would have otherwise been entitled.[17]

Thus, Colgate's "same-benefit" argument does not disturb our conclusion

that the RAA's language is unambiguous. We find nothing inherently "illogical"

or ambiguous about the RAA's comparison of the AE of LS to a winning annuity,

and that comparison does not become any more ambiguous if the lump sum is

technically an alternate form of the PRA annuity. Because "unambiguous

language in an ERISA plan must be interpreted and enforced in accordance with

its plain meaning," *Strom*, 497 F.3d at 244 n.6 (citation omitted), we affirm the

district court's grant of summary judgment to the class plaintiffs as to Error 1.

> *2. Colgate's preferred reading of the RAA is not a reasonable interpretation of the text*

---

[17] Colgate argues that the whipsaw forfeiture was entirely resolved by the *Colgate I* settlement. *See* Appellants' Br. 40–41; 51–52. We address the relationship between the RAA and the *Colgate I* settlement in detail *infra* Section II.C.3. For now, we simply note that the RAA was drafted prior to the initiation of the *Colgate I* lawsuit, so its settlement has no impact on our analysis of textual ambiguity.

When Colgate first moved for summary judgment, it unsuccessfully argued that the text unambiguously required its preferred reading; now, it adopts the position that the RAA is "susceptible to more than one reasonable interpretation." Appellants' Br. 27. However, we do not think that Colgate's alternative interpretation of the RAA is a reasonable construction of the Plan's text.

Colgate argues that the "annuity benefit otherwise payable to the Member" refers only to the grandfathered annuity, not the larger of the grandfathered annuity or PRA annuity. According to the defendants-appellants:

> Colgate interprets the term "otherwise payable" in the text of the RAA to direct the Committee only to those portions of the Appendices that relate to the "old" Grandfathered Formula benefit that would otherwise have been payable to Participants *had the plan conversion not occurred*, and not the "new" PRA annuity benefit referenced elsewhere in the Appendices (*i.e.*, the "new" 2(b)(ii) Annuity). The reason for this is straightforward: the RAA ensures that a Grandfathered Participant receives the full value of the "old" benefit that the Participant would have received if there were no "new" PRA benefit. The phrase "otherwise payable" means the benefit that would otherwise be paid if there were no "new" benefit.

*Id.* at 28–29 (emphasis added). That is, Colgate argues that it is reasonable to interpret the phrase "otherwise payable" as drawing a distinction between pre- and post-Plan conversion benefits. The "straightforward" reason Colgate gives for its pre-/post-conversion interpretation is that it would fulfill the alleged

purpose of the RAA, which Colgate claims is to remedy a forfeiture of grandfathered benefits. Colgate also argues that the words "as applicable"—used in reference to the Plan's appendices—is similarly ambiguous and could reasonably be read to refer to "only those sections of the Appendices that apply to the 'old' Grandfathered Formula benefit." *Id.* at 35. Again, Colgate's only support for this interpretation of "as applicable" appears to be that it comports with that RAA's alleged purpose "to ensure that the value of the 'old' Grandfathered Formula benefit is not forfeited, to the extent it is not fully paid by the 'new' PRA lump sum." *Id.*

We find nothing in the text of the Plan that suggests that the phrases "otherwise payable" and "as applicable" refer specifically to the annuity that Colgate would have paid had the Plan not been converted to a cash-balance plan in 1989. Indeed, this reading requires inserting into the RAA an additional qualification, namely, that "benefit otherwise payable" actually means "benefit otherwise payable *had the plan conversion not occurred* in 1989." Nevertheless, Colgate's proffered interpretation begins with the proposition that the RAA is simply not concerned with the whipsaw forfeiture, and Colgate urges us to find this interpretation reasonable because it would align with that alleged purpose.

But Colgate does not divine that purpose from the text of the Plan; instead, it draws on "substantial extrinsic evidence demonstrating that the purpose of the RAA was to ensure that Grandfathered Participants received the full value of their 'old' Grandfathered Formula benefit even if they elected to receive their benefit under the 'new' PRA formula as a lump sum." *Id.* at 39. Colgate thus asks us to put the extrinsic evidence cart before the textual horse. The law does not permit us to do so.

We repeat: "It is axiomatic that where the language of a [plan] is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002). And "[w]hether ERISA plan language 'is ambiguous is a question of law that is resolved *by reference to the contract alone*.'" *Strom*, 497 F.3d at 244 n.6 (emphasis added) (quoting *O'Neil*, 37 F.3d at 59). Therefore, we will not invoke extrinsic evidence of a Plan's purpose to inject ambiguity into otherwise unambiguous language. It may be true that Colgate's intent when adopting the RAA was different from the actual effect of the text's unambiguous language, but that does not control our analysis. *See, e.g., AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 729 (2d Cir. 2010)

("The 'primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract.'" (citation omitted)).

### 3. *The language of the RAA is not rendered ambiguous by its effects*

For largely the same reasons, we also conclude that any allegedly unusual effects flowing from the RAA's plain meaning do not change our ambiguity analysis. That said, we also note that certain effects of our interpretation, which may seem odd at first, may not be so confounding upon closer review.

First, the RAA was adopted in 2005 and was intended to apply both retroactively (to 1989) and prospectively. Colgate notes, however, that by 2005 "the Plan had already been amended to eliminate the whipsaw issue for the 'new' PRA benefit on a going-forward basis, meaning that there was no prospective § 417(e) issue for the RAA to address." Appellants' Br. 50 (internal citation omitted). In our view, the fact that the RAA also applied prospectively does not refute the conclusion that, as drafted, it also remedies prior whipsaw violations. Rather, the RAA's combined prospective and retrospective application comports with an interpretation of the RAA that addresses both of the Plan's forfeiture problems—one limited to the past and one continuing—for a large subset of members at once.

That "two-birds-one-stone" approach to resolving the Plan's overlapping forfeiture issues also helps to answer a second question related to the RAA's effect. Under the RAA, a residual annuity is available only to a lump sum recipient who is "entitled to a greater benefit than h[er] Accrued Benefit," App'x 366—i.e., any participant whose grandfathered annuity exceeds her PRA annuity or who elected to make employee contributions. Yet there are some participants, such as those who joined after the Plan's conversion in 1989, who are not eligible for a residual annuity but who still suffered a whipsaw forfeiture. Colgate insists that "it would have been illogical for [it] to attempt to remedy the [whipsaw] forfeiture issue through residual annuities available only to Grandfathered Participants, as opposed to remedying the issue for *all* Plan participants who elected to receive their 'new' PRA benefit as a lump sum rather than an annuity." Appellants' Br. 50–51 (emphasis in original).

We think it makes perfectly good sense to conclude that while Colgate was in the process of fixing an issue related to forfeiture of grandfathered benefits, it would use the same mechanism to partially remedy a contemporaneous whipsaw violation, inflicted upon those same grandfathered participants. While the Committee was already considering the unique plights of grandfathered

participants, it would have been convenient for it to adopt a single amendment that remedied all forfeitures that those members had suffered. Thus, we see nothing inherently illogical about the RAA's scope, as conceived on our construction of its terms.

Third, Colgate raises concerns about the relationship between the RAA and the *Colgate I* settlement. Colgate asserts that under the plaintiffs-appellees' reading the class would receive an unwarranted windfall because members were already "compensated for the alleged underpayment of their PRA lump sum in *Colgate I*," and "the current class is claiming again the difference between their *Colgate I* settlement award and their PRA annuity." Reply Br. 17. In Colgate's view, when *Colgate I* was settled, the unlawfulness of the whipsaw violation was resolved, even though class members received a settlement award that was less than the full gap between the PRA annuity and the lump sum that they had received. The reason for the incomplete remedy, Colgate explains, is that the settlement award "was discounted to reflect the plaintiffs' likelihood of success (as most settlements are)." *Id.* at 16. That "settled" difference is also the amount that the instant class is attempting to recoup via their RAA claims, which Colgate

describes as "a second bite at the apple." *Id.* On our read, the class plaintiffs do not stand to earn any undue windfall from a favorable judgment in this case.

Colgate's complaint is premised on the notion that *Colgate I* settled all claims alleging an impermissible gap between the value of the PRA lump sum and the value of the PRA annuity. However, that settlement agreement explicitly excluded any claims that were "based upon, or ar[o]se under" the RAA. App'x 304. Colgate does not dispute that the *Colgate I* settlement exempted all future RAA claims; instead, Colgate again relies on extrinsic evidence of the RAA's purpose in an effort to avoid this aspect of the settlement. Colgate begins with the assumption that the instant class members' claims could not possibly arise under the RAA because "the RAA . . . was never intended to address them." Appellants' Br. 52. According to Colgate, "the RAA is about reconciling 'new' with 'old'" (i.e., the PRA lump sum with the grandfathered annuity) and "*not* comparing 'new' and 'new'" (i.e., the PRA lump sum and PRA annuity). *Id.* at 51–52 (emphasis in original). But this is a circular argument, essentially claiming that Colgate's current interpretation of the RAA must be correct because, otherwise, Colgate's interpretation of the RAA (when it settled *Colgate I*) was incorrect.

41

We conclude otherwise. The plaintiffs are not "attempting to relitigate the settled claims in *Colgate I*," *id.* at 52, by asserting their claims under the unambiguous language of the RAA. When Colgate agreed to carve out all future RAA claims from the *Colgate I* settlement, it presumed that its reading of the RAA was correct. Now, when faced with a determination that its interpretation is erroneous, it seeks to rewrite the settlement. But the settlement clearly excludes any claims under the RAA, whatever they may be. App'x 304; *see also id.* at 303 (listing all "Released Claims" and noting "[f]or avoidance of doubt, the foregoing does not include *any claims* arising under the Residual Annuity Amendment" (emphasis added)). These plaintiffs, having demonstrated that the plain text of the RAA guarantees them an annuity that covers the gap between their lump sum and their winning PRA annuity,[18] are now entitled to recover that full difference.

Thus, we decline to read ambiguity into the otherwise unambiguous text

---

[18] The *Colgate I* settlement clarifies that "any claims under the Residual Annuity Amendment are subject to [an] offset" in "an amount based upon the individual net settlement benefit" a participant received. App'x 305. This prevents a member from collecting more than the full gap between the AE of LS and her PRA annuity.

of the RAA based on these effects-based arguments.[19]

* * *

We are faced with a choice between (1) the unambiguous meaning of the Plan's text that may have some peculiar, though not inexplicable, effects, and (2) an interpretation that appears to us to be unreasonable, but that—when viewed in light of extrinsic evidence of purpose—results in outcomes that seem more in line with the defendants-appellants' preferences. Under these circumstances, as we read our case law, we have no choice but to adopt what we see as the unambiguous reading. We therefore affirm the district court's grant of summary judgment to the plaintiff class on Error 1.

---

[19] These arguments about odd effects of the unambiguous text of the RAA might presume that Colgate drafted the Plan clearly and administered it rationally. Of course, the history of the Plan is one of flawed design and implementation. From not performing whipsaw calculations and failing to achieve equivalence between lump sums and grandfathered annuities, to neglecting to retroactively apply amendments to correct those original errors, Colgate's cornucopia of missteps has led to a patchwork resolution and years of assorted litigation, including this case. Given these past events, it is unsurprising that the Commission enacted an RAA that only partially resolves the whipsaw forfeiture, or that Colgate would reach a legal settlement that does not preclude quite as many future claims as it might have hoped. Ultimately, our duty is to interpret the text of the RAA faithfully, not to imagine another version that might seem more rational or practical.

### III. Required Projection Rates

Colgate argues that irrespective of our decision to affirm the district court's grant of summary judgment on Error 1, we should reject the court's conclusion that Colgate must use specific rates when calculating the AE of LS and PRA annuity for the purpose of determining residual annuities. Colgate insists that, instead, the Committee should be entitled to retroactively determine which interest rates to use for those calculations. We disagree, and, instead, affirm the district court's conclusion that Colgate must use the PBGC rate to calculate the AE of LS and the 20+1% rate to calculate the PRA annuity.

### A. PBGC Rate for AE of LS Calculations

The district court held that Colgate must use the PBGC rate when calculating the AE of LS largely because that was the rate required by I.R.C. § 417(e) during the period at issue for present valuing benefits. *See Colgate II*, 481 F. Supp. 3d at 264–65, 269. We agree with the district court's conclusion, but for a simpler reason: The Plan itself requires the use of the PBGC rate.

According to minutes of a meeting held on February 6, 2014, the Committee met to discuss the calculation of residual annuities. *See* App'x 854–56. Liza LeAndre, the Chief Benefits Counsel, "provided the Committee . . . with an

overview of the [RAA]" that aligned with the interpretation Colgate

unsuccessfully advanced in this litigation. *Id.* at 855. The minutes then explain:

> Ms. LeAndre indicated that to calculate the residual annuity, determining the age 65 Actuarial Equivalent amount of the PRA benefit [i.e., the AE of LS] is required. Ms. LeAndre explained that the interest rate to be used for this calculation for benefits paid between 1989 and 2002 needed to be determined. Ms. LeAndre recommended that the applicable interest rate statutory basis of PBGC rates be used to calculate residual annuities for such pre-2002 calculations. The Committee, acting in its settlor capacity, approved this recommendation.

*Id.* Put simply, the Committee adopted a resolution related to "determining the

[AE of LS]" for the purpose of "calculat[ing] residual annuities." *Id.* That

resolution specified that "the interest rate to be used for this calculation for

benefits paid between 1989 and 2002" is the PBGC rate. *Id.* Because these

documents were adopted by the Committee "in its settlor capacity," *id.*, the terms

of the resolution are part of the Plan itself. *See Hughes Aircraft Co. v. Jacobson*, 525

U.S. 432, 444 (1999) (noting that a "settlor" has the power to amend a Plan and to

determine "who is entitled to receive Plan benefits and in what amounts, or how

such benefits are calculated").

Colgate does not dispute that this resolution is a binding part of the Plan.

Rather, it emphasizes that LeAndre's pre-resolution summary of the RAA

maintained (incorrectly) that "the [RAA] provided for residual annuities to be

paid to eligible employees who elected a lump sum equal to the excess value of the *grandfathered formula* benefit over the personal retirement (PRA) benefit." App'x 855 (emphasis added). Colgate then argues that the selection of the PBGC rate was limited to "this calculation of [*sic*] benefits." Reply Br. 26–27 (emphasis omitted).[20]

We disagree. The "calculation" to which the resolution applies is set forth in the immediately preceding sentence of the minutes, which instructs that "to calculate the residual annuity, determining the [AE of LS] is required." App'x 855. And the selection of the PBGC rate was made "for this calculation for benefits paid between 1989 and 2002." *Id.* The plaintiffs' benefits were paid during this time, and the resolution clearly establishes that the PBGC rate shall be used to "determin[e] the [AE of LS]" in order "to calculate residual annuities" for such members. It matters not that Colgate maintained a more limited, atextual interpretation of the RAA at the time of the resolution. The Committee adopted an unqualified resolution that "the applicable interest rate statutory

---

[20] Colgate's reply brief incorrectly quotes the Committee minutes. The minutes did not say "the interest rate to be used *for this calculation of benefits* paid between 1989 and 2002 needed to be determined," Reply Br. 26 (emphasis added); rather, it stated that "the interest rate to be used *for this calculation for benefits* paid between 1989 and 2002 needed to be determined," App'x 855 (emphasis added).

basis of PBGC rates be used to calculate residual annuities for such pre-2002 calculations." *Id.*

More broadly, we think it would be arbitrary to construe the text of the Plan to allow for distinct calculations of the AE of LS depending on the annuity to which it is compared. A comparison of the AE of LS to the PRA annuity is not a "new calculation." *See* Reply Br. 27. It is part of a longstanding calculation that, in the past, Colgate incorrectly interpreted. The RAA has always called for only a single calculation using two variables: (1) the AE of LS and (2) a member's winning annuity under Appendix C § 2(b). It would be unreasonable for Colgate to calculate the first variable—the AE of LS—differently depending on a characteristic of the distinct second variable in the RAA's formula. Having already resolved to calculate the AE of LS for some participants with the PBGC rates (and having consistently used that rate in such calculations thus far, *see* Appellants' Br. 56 n.10), we would decline to let Colgate change those rates for other participants simply because their winning annuity is different.

Because we conclude that the Plan itself requires the use of the PBGC rate when calculating the AE of LS, we need not address the district court's alternative reasons for reaching the same determination.

B.        20+1% Rate for Appendix C § 2(b) PRA Annuity Calculations

We also agree with the district court that for the purpose of calculating the Appendix C § 2(b)(ii) PRA annuity, Colgate must use the 20+1% rate to project a participant's cash balance account forward and convert it into an age 65 annuity. *Colgate II*, 481 F. Supp. 3d at 264, 269.  Section 1.3 of the Plan states that the 20+1% rate must be used "[f]or purposes of converting a Member's Account into a single life annuity payable for the life of the Member starting at Normal Retirement Date."  App'x 405–06.  A brief recitation of the relevant plan mechanics reveals that this is the appropriate rate for calculating a participant's PRA annuity.

As explained *supra* Section II.C.1, the RAA requires determining a member's winning annuity under Appendix C § 2(b), which is the greater of the grandfathered annuity (described in Appendix C § 2(b)(i)) and the PRA annuity (described in Appendix C § 2(b)(ii)).  *See* App'x 366, 480–81.  Where a member's winning annuity is the PRA annuity, it is that member's "Accrued Benefit,"[21] which the Plan defines as "a monthly annuity for the life of the Member . . .

---

[21] This is so because Appendix C § 2(b)(ii) defines the PRA annuity through cross-references to the "benefit payable pursuant to Section 6.2 . . . , Section 6.3 . . . or Section 6.4(a)(ii)," App'x 481, each of which describes "the benefit payable to such Member" as "h[er] Accrued Benefit" or some optional form of benefit that is the actuarial equivalent thereof, App'x 433–34.

commencing at Normal Retirement Age." *See id.* at 405. This definition matches the specifications of § 1.3, which applies "[f]or purposes of converting a Member's Account into a single life annuity payable for the life of the Member starting at Normal Retirement Date." App'x 405–06. As such, when calculating a member's PRA annuity, § 1.3 of the Plan requires Colgate to use the 20+1% projection rate.

Colgate takes issue with this reading, asserting that § 1.3 prescribes the 20+1% rate only for the "calculation done at age 65 for a Participant who elects the annuity form of the [PRA] benefit." Appellants' Br. 56–57. Colgate insists that "Section 1.3 says nothing about how to project a cash balance account to age 65 when a participant chooses to receive his or her benefit *prior* to normal retirement age." *Id.* at 57 (emphasis in original). That is, Colgate breaks the conversion of a member's PRA account into two steps, each permitting different interest rates: (1) projection of the account to age 65 and (2) conversion of the age 65 projected account into an annuity. Colgate argues that § 1.3 only requires using the 20+1% rate in step 2 to convert an age 65 PRA account into an annuity, but not in step 1 to project the account of a younger member forward to the age of 65 prior to conversion. Therefore, Colgate argues that it should be able to

decide anew which rate to use when projecting PRA accounts to age 65 for

residual annuity determinations.

We are not convinced. First, under the plain text of the Plan, § 1.3's rate

selection applies to the whole process of "converting" a member's account into an

age 65 annuity, without distinguishing between the steps of that conversion

calculation. The Plan selects the 20+1% rate "[f]or purposes of converting a

Member's Account" without reference to the age of that account. App'x 405. If a

member is not yet 65, the process of "converting [that] Member's Account" into

an age 65 single life annuity requires projection. Therefore, for a pre-retirement-

age member, § 1.3 contemplates that the 20+1% rate will be used to project her

PRA account to the age of 65 and to convert that projected PRA balance into an

annuity.

Second, even if we were to determine that § 1.3 is ambiguous, we would

not defer to Colgate's interpretation because it would render the plan unlawful.

"[C]ontracts should not be interpreted to render them illegal and unenforceable

where the wording lends itself to a logically acceptable construction that renders

them legal and enforceable . . . ." *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977).

Colgate notes that the Plan "says nothing about how to project a cash balance

account to age 65" and that "the applicable interest rate for projection remains an open question" that Colgate should have the discretion to resolve. Appellants' Br. 57; *see also* App'x 1560 ("Neither Section 1.3 nor any other section of the Plan explains how to project a cash balance account forward to age 65 when a participant has *not* reached normal retirement." (emphasis in original)). But if we were to adopt this interpretation, we would, in effect, be concluding that the Plan contains no instructions for calculating the accrued benefit for anyone under the age of 65. This omission would render the Plan unlawful because I.R.C. § 401(a)(25) requires that a participant's accrued benefit be "definitely determinable," i.e., calculated under a formula with no employer discretion. *See* I.R.C. § 401(a)(25) ("A defined benefit plan shall not be treated as providing definitely determinable benefits unless, whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, such assumptions are specified in the plan in a way which precludes employer discretion."); Treas. Reg. § 1.401-1(b)(1) (as amended in 2007) (requiring "definitively determinable benefits").[22]

---

[22] Colgate seeks to avoid this issue by noting that "there is no private right of action to enforce a tax-qualification provision" like the "definitely determinable" requirement. Reply Br. 29. But this is irrelevant. The plaintiffs-appellees do not

Third, and finally, we find it difficult to credit Colgate's proposed approach because the company's past practice undercuts its interpretation of the Plan. In this litigation, Colgate argues that the Plan does not set a projection rate, but in practice Colgate consistently used the 20+1% rate as a projection rate to calculate the PRA annuity for members who departed during the relevant period. Consistent with the text of the Plan, Colgate informed these members that their PRA annuities were worth a certain amount based on a 20+1% projection rate when they left the company. Colgate cannot arbitrarily adopt a lower projection rate to retroactively change those prior valuations.

---

bring any claim based on that requirement but merely urge us to consider it when evaluating Colgate's own interpretation.

Colgate additionally argues that it would be reasonable for it to select the lower "interest crediting rate" as an alternative. *See* Appellants' Br. 57; Reply Br. 29. In offering this rate, Colgate appears to make conflicting arguments: on one hand it claims that the Plan does not offer any explanation for how to project an account forward, while on the other, it suggests a reasonable interpretation of the text would lead to applying the Plan's interest crediting rate. We see nothing in the text that would suggest the Plan selected the interest crediting rate as a projection rate when converting accounts into age 65 annuities. The interest crediting rate is defined as the rate at which a member's PRA account actually accrues interest, without any reference to projecting hypothetical, future account growth. *See* App'x 423. Although the Plan cannot select a projection rate that is "less than the interest credits provided under the plan," *Esden*, 229 F.3d at 166, it does not follow that the Plan could neglect to select a projection rate and simply afford the plan administrator the discretion to either select a higher rate or default to the interest crediting rate.

For these reasons, we affirm the district court's conclusion that Colgate is required to use of the 20+1% projection rate when calculating the Appendix C § 2(b)(ii) PRA annuity for the purpose of determining a member's residual annuity.

## IV.    Error 3

A mortality discount accounts for the possibility that the participant might die before reaching retirement age when calculating the present value of a benefit.  The Plan clearly calls for the application of a PRMD, but the plaintiffs argued to the district court that Colgate's use of a PRMD to calculate residual annuities violated I.R.C. § 417(e)'s and ERISA § 203(a)(2)'s actuarial equivalence rules.  The district court granted summary judgment to the class plaintiffs on this error.  *See Colgate II*, 481 F. Supp. 3d at 266–69.  We affirm.[23]

In theory, under a plan with no survivorship—i.e., a plan in which a member's right to collect her accrued benefit does not pass to her surviving beneficiary in the event of her premature death—the promise of an age 65

---

[23] The district court noted that, "[a]s a threshold matter, Defendants d[id] not oppose Plaintiffs' arguments regarding Error 3 in their opposition brief," and thus concluded that "[s]ummary judgment [was] granted on this ground alone." *Colgate II*, 481 F. Supp. 3d at 267.  On appeal, Colgate makes no effort to contest the district court's determination regarding its failure to respond.

annuity may be less valuable to a pre-retirement-age member than an upfront

lump sum payment: the member is guaranteed to get paid now if she elects a

lump sum, but if she waits for an annuity, she may forfeit her accrued benefit if

she dies before the age of 65.  Colgate claims that its use of a PRMD in calculating

the AE of LS accurately reflects this risk of early death.  However, if a member's

pre-retirement death would have little or no effect on the value of the benefit that

she or her beneficiary receives, there is no risk that she will forfeit her benefit.

Therefore, if a plan guarantees survivor benefits that are substantially similar in

value to a member's accrued benefit, it is improper to use a PRMD to discount

the present value of a future annuity.

This issue appears to be a matter of first impression in this Circuit, but we

are persuaded—as the district court was—by the careful reasoning of our sister

circuits finding ERISA and I.R.C. violations in similar circumstances.[24]

For example, in *West v. AK Steel Corp.*, 484 F.3d 395 (6th Cir. 2007), the

Sixth Circuit held that an impermissible forfeiture occurred when a plan

---

[24] *See, e.g.*, *West v. AK Steel Corp.*, 484 F.3d 395, 411 (6th Cir. 2007); *Berger*, 338 F.3d at 764; *see also Ruppert v. Alliant Energy Cash Balance Pension Plan*, No. 08-cv-127-bbc, 2010 WL 5464196, at *2, *16–18 (W.D. Wis. Dec. 29, 2010); *Crosby v. Bowater Inc. Ret. Plan For Salaried Emps. of Great N. Paper, Inc.*, 212 F.R.D. 350, 360–62 (W.D. Mich. 2002), *vacated on other grounds*, 382 F.3d 587 (6th Cir. 2004).

administrator applied a PRMD to reduce the present value of a lump sum distribution when the death benefit was equal to a participant's accrued benefit, *id.* at 411. Under the plan in *West*, "[i]f a Plan participant die[d] before reaching the age of 65, the Plan's terms provide[d] that the surviving spouse or other beneficiary receive[d] a death benefit 'equal to the participant's pension benefit.'" *Id.* The death benefit was defined as "the actuarial equivalent of the participant's accrued benefit." *Id.* On those facts, the court determined that "[b]ecause the beneficiary receives a death benefit equal to the participant's accrued benefit, he or she 'steps into [the participant's] shoes and is entitled to his entire pension benefit.'" *Id.* (second alteration in original) (quoting *Berger*, 338 F.3d at 764). "Even if the participant were to die before the age of 65, his or her beneficiary is still entitled to the entire accrued benefit," and the "[u]se of a mortality discount for the period before age 65 would, accordingly, result in a partial forfeiture of benefits in violation of the ERISA vesting rules (i.e., the anti-forfeiture rules)." *Id.* (citation omitted).

We find this logic persuasive here, inasmuch as the Plan also defines the death benefit as "the Actuarial Equivalent of the Accrued Benefit." App'x 429. As a result, in the event of a member's death, her beneficiary would receive a

benefit that is effectively equal to the accrued benefit such that the beneficiary

"steps into the participant's shoes and is entitled to [her] entire pension benefit."

*West*, 484 F.3d at 411 (internal alteration and citation omitted).  The RAA

functions to remedy the underpayment of lump sums with an additional residual

annuity such that the lump sum and residual annuity together ensure

compliance with the I.R.C.'s and ERISA's present value requirements.  *See* ERISA

§ 203(a)(2); I.R.C. § 417(e); *see also* 26 C.F.R. § 1.417(e)-1(d)(1)(i) ("The present

value of any optional form of benefit cannot be less than the present value of the

normal retirement benefit . . . .").  Because the value of the benefit paid if a

member dies before 65 is the same as the Plan's normal retirement benefit, we

conclude that Colgate's use of a PRMD to determine the present value of the

lump sum when calculating a make-whole residual annuity results in an optional

form of benefit that is less than the corresponding normal retirement benefit.

Colgate's primary response is to argue that the Plan's "death benefit . . . is

an incidental benefit and not the *accrued retirement benefit*," so that when a

participant dies, she forfeits her entire accrued benefit and her beneficiary

becomes entitled to a distinct benefit of essentially equal value.  Appellants' Br.

59 (emphasis in original).  But as reflected in this case law, a Plan administrator

cannot undervalue a member's accrued benefit simply because a death benefit is defined as the "actuarial equivalent of the accrued benefit" rather than being the "accrued benefit" itself.  To hold otherwise would defeat the purpose of ERISA's and the I.R.C.'s present value requirements.

Additionally, Colgate relies on a proposed 2016 IRS regulation which it claims explicitly rejects our approach regarding the unlawful use of a PRMD in this context.  *See* Update to Minimum Present Value Requirements for Defined Benefit Plan Distributions, 81 Fed. Reg. 85,190 (proposed Nov. 25, 2016). Regardless of whether the document was intended to reflect the IRS's view of "current law" as Colgate suggests, *see* Appellants' Br. 60, the proposed regulation has no legal effect.  *See LeCroy Rsch. Sys. Corp. v. Comm'r of Internal Revenue*, 751 F.2d 123, 127 (2d Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing.").  Nor is it clear that the proposed regulation—if adopted—would support Colgate's argument.[25]  In any event, an unadopted IRS regulation does not disturb our reasoning.

---

[25] As the district court noted, "the proposed regulation appears to forbid the application of a PRMD to determine the present value of the entire accrued benefit if any portion of the accrued benefit is derived from contributions made by the employee, as is the case here." *Colgate II*, 481 F. Supp. 3d at 269.

We therefore affirm the grant of summary judgment to the plaintiffs on

Error 3.

## CONCLUSION

We have considered the defendants-appellants' remaining arguments on

appeal and conclude that they are without merit.  For the foregoing reasons, we

AFFIRM the order and final judgment of the district court.